**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

| | | |
|---|---|---|
| WALI OMARKHEIL, | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | **COMPLAINT** |
| UNITEDHEALTH GROUP INCORPORATED, | : | |
| JOSIANE PELUSO, DAVID WILLHOFT and | : | |
| JENNIFER ST. GEORGE, in their individual and | : | **Jury Trial Demanded** |
| professional capacities, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------- X

Plaintiff Wali Omarkheil ("Plaintiff" or "Mr. Omarkheil") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     Defendant UnitedHealth Group Incorporated ("UnitedHealth" or "the Company") publicly boasts that:

> ***We behave***:
> We will speak the truth. We will deliver on our promises. We will have the courage to acknowledge mistakes and do whatever is needed to address them.[1]

2.     Unfortunately, this promise appeared to be nothing more than lip service to Wali Omarkheil, a nearly twelve-year employee of UnitedHealth who was abruptly terminated just weeks after he made protected complaints to UnitedHealth about his supervisor's discriminatory comments about Mr. Omarkheil's national origin, race and ethnicity, and religion.

3.     When Defendant Josiane Peluso became Mr. Omarkheil's new supervisor in early 2018, she immediately began a campaign of unlawful harassment and discriminatory treatment based on Mr. Omarkheil's Afghan national origin, his Afghani race/ethnicity and religion (Islam).  Among other dangerous and hateful statements, Ms. Peluso suggested that Mr.

---

[1]     See https://www.unitedhealthgroup.com/about/mission-values.html, last visited January 15, 2019.

Omarkheil was a terrorist, forced him to violate his religious practices on multiple occasions and openly criticized him for not prioritizing White customers and clients.

4.     When Mr. Omarkheil finally gathered the courage to complain to UnitedHealth, the Company responded by abruptly terminating Mr. Omarkheil's employment.

5.     Despite over a decade of excellent performance, and without warning, UnitedHealth and Ms. Peluso terminated Mr. Omarkheil without cause just *weeks* after he escalated his complaints to the Defendant David Willhoft, UnitedHealth's Vice President of Sales and Marketing and Defendant Jennifer St. George, UnitedHealth's Senior Employee Relations Case Manager.  The actions of UnitedHealth and the individual Defendants blatantly violated federal, state and local law prohibiting employment discrimination on the basis of religion, race/ethnicity and national origin.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because UnitedHealth is a corporation doing business in the State of New York and is subject to personal jurisdiction in this district, and a substantial portion of unlawful conduct alleged herein occurred in this district.

## ADMINISTRATIVE PROCEDURES

8.     Following the filing of this Complaint, Mr. Omarkheil will file a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"),

alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

("Title VII").  When the EEOC issues Mr. Omarkheil a notice of right to sue or otherwise

dismisses his charge, he will seek leave to amend this Complaint to add claims under Title VII.

9.      Pursuant to NYCHRL § 8-502, a copy of this Complaint will be served upon the

New York City Commission on Human Rights and the New York City Law Department, Office

of the Corporation Counsel, within 10 days of its filing, thereby satisfying the notice

requirements of that section.

10.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

11.     Plaintiff Wali Omarkheil is a resident of Commack, New York.  Mr. Omarkheil

was terminated by Defendants from his position as Regional Marketing Director after working

for Defendants in New York City and Long Island, New York from 2007 to August 23, 2018.  At

all relevant times, Mr. Omarkheil met the definition of an "employee" under all applicable

statutes.

12.     Defendant UnitedHealth Group is a Minnesota entity with its principal place of

business located at 9900 Bren Road, Minnetonka, Minnesota 55343.  At all relevant times,

UnitedHealth Group met the definition of an "employer" under all applicable statutes.

13.     Defendant Josiane Peluso was, at all relevant times, a Manager at UnitedHealth.

At all relevant times herein, Defendant Peluso was Plaintiff's "employer" under all relevant

statutes.

14.     Defendant David Willhoft was, at all relevant times, Vice President of Sales and

Marketing at UnitedHealth.  At all relevant times herein, Defendant Willhoft was Plaintiff's

"employer" under all relevant statutes.

15.     Defendant Jennifer St. George was, at all relevant times, an Employee Relations Case Manager at UnitedHealth.  At all relevant times herein, Defendant St. George was Plaintiff's "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.     MR. OMARKHEIL'S BACKGROUND AND CAREER

16.     Mr. Omarkheil is an experienced Marketing and Outreach director with an extensive background in marketing and project management.  He holds a Bachelor of Arts in Business Administration from St. Joseph's College.

17.     Mr. Omarkheil was raised in Afghanistan and immigrated to the United States when he was about 11 years old.  He is a United States citizen and is of the Muslim faith.

18.     Before joining UnitedHealth, Mr. Omarkheil worked as an Application Quality Assurance Representative for Health First Inc., where he was responsible for planning, directing and managing aspects of marketing and sales for all of Health First Inc.'s products.

19.     After six years of employment, Mr. Omarkheil was aggressively recruited by UnitedHealth to join their team.

20.     In March of 2007, Mr. Omarkheil accepted an employment offer with UnitedHealth as a Medicaid Sales Representative.

21.     As a Medicaid Sales Representative, Mr. Omarkheil would engage with different communities around the five boroughs of New York City and Long Island to increase individual enrollment in UnitedHealth's Medicaid program.

22.     After around one year in the position, and in recognition of his excellent work, UnitedHealth promoted Mr. Omarkheil to Supervisor.  As a Supervisor, Mr. Omarkheil managed

a staff of approximately eight individuals, ensuring that they developed their assigned territories and met monthly deadlines.

23.     After only two years in that role, Mr. Omarkheil was again promoted, this time to Regional Marketing Director for the Brooklyn and Staten Island region, at a salary of approximately $118,000 per year.  As Regional Marketing Director, Mr. Omarkheil managed a sales force of 57 Sales Associates as well as five supervisors.  Mr. Omarkheil's region included the largest membership, most regional staff and biggest regional provider network for UnitedHealth in New York State.

24.     Over the last eight years, Mr. Omarkheil has consistently exceeded UnitedHealth's regional annual sales targets.

25.     Specifically, Mr. Omarkheil played a crucial role in both growing the Company's Brooklyn membership from approximately 130,000 members to over 200,000 members and in expanding the Company's operations by opening a new storefront at the Downtown Brooklyn location.

26.     Mr. Omarkheil's success in expanding the Company's business was reflected in superb reviews and exceptional scores in the Company's vital signs survey report.

## II.    MR. OMARKHEIL'S NEW SUPERVISOR ENGAGES IN BLATANT HARASSMENT AND DISCRIMINATION

27.     In February 2018, Mr. Omarkheil was assigned a new manager, Josiane Peluso. Ms. Peluso had worked at the Company before, but never in an upper management role.  Almost immediately, Ms. Peluso began targeting Mr. Omarkheil with discriminatory treatment and conduct.

28.     During Ms. Peluso's first "Manager's Meeting," at which Ms. Peluso was supposed to make introductions and get to know her direct reports, Ms. Peluso began by complaining that the security downstairs was extremely strict.

29.     She then conspicuously turned to Mr. Omarkheil and, while making prolonged eye contact, stated with disgust in her voice that "it is because of all the darn terrorists we have in this country."

30.     It was abundantly clear to Mr. Omarkheil that Ms. Peluso was drawing an association between him, the only Muslim person at the meeting,[2] and terrorists and/or an anti-American agenda.

31.     The next day, Ms. Peluso scheduled a one-on-one meeting with Mr. Omarkheil under the pretense that it would be about his region and his work for the Company.

32.     However, Ms. Peluso apparently was not meeting with him to discuss Mr. Omarkheil's work, but rather to communicate to Mr. Omarkheil that his religious beliefs were alien and unacceptable to her.

33.     Incredibly, Ms. Peluso began her very first one-on-one conversation with Mr. Omarkheil by stating:

**Before we can start our one-on-one meeting, I want you to know that I am a Christian and I take my religion very seriously.  I know you are a Muslim, and I will do my best to try to treat you right**.

34.     Unsurprisingly, after such an open and direct declaration of discriminatory animus, Ms. Peluso did not treat Mr. Omarkheil right.  She quickly

---

[2]     In addition to this discriminatory remark leveled at Mr. Omarkheil, later in the meeting Ms. Peluso referred to the portion of UnitedHealth's client base with disabilities while doing a highly offensive imitation of an individual with disabilities, consisting of her scrunching her arm to her chest while crossing her eyes and pursing her lips.

concluded the meeting by suggesting to Mr. Omarkheil that he might want to start up his own business, and that he could make a lot of money doing something else.

35.     It was clear to Mr. Omarkheil that Ms. Peluso wanted him out of the Company, and her assurance to treat him fairly was not convincing nor was it supported by her subsequent actions and conduct.

36.     After this shocking and ominous initial meeting, Ms. Peluso was seemingly preoccupied with Mr. Omarkheil's whereabouts, and constantly accused him of being lazy or absent from work without any apparent justification.

37.     Throughout March and April 2018, Ms. Peluso, who works from multiple locations, would call Mr. Omarkheil three to four times a day solely to check on him and make sure he was working.  Ms. Peluso would demand constant updates from Mr. Omarkheil about his schedule and would require him to pass his phone to his coworkers so that she could talk with them and supposedly obtain proof or confirmation that he was indeed doing his job.

38.     In these ways and many others, Ms. Peluso treated Mr. Omarkheil markedly worse than his fellow employees.

39.     Ms. Peluso would often require Mr. Omarkheil to attend events with her simply so that he would be forced to perform low-grade tasks not typically done by management employees, such as pitching event tents, moving chairs, delivering decorative flower arrangements and picking up trophies for upcoming award ceremonies.

40.     Indeed, these tasks were ordinarily reserved for individuals multiple ranks below that of Mr. Omarkheil.

41.     To the best of Mr. Omarkheil's knowledge, no Caucasian or Christian managers were asked to submit to such menial tasks by Ms. Peluso or other managers.

42.     Mr. Omarkheil complained to Ms. Peluso that he did not understand why she was forcing him to take time away from managing his region to do manual labor-intensive tasks for her.

43.     Ms. Peluso responded that she purportedly would rather have him do the work than pay the appropriate employees overtime pay.  She did not address why Mr. Omarkheil, and not White, European-descent or Christian coworkers, were asked to do such tasks or errands.

44.     On May 9, 2018, Ms. Peluso scheduled a meeting with Mr. Omarkheil and a doctor in Brooklyn at a doctor's office.

45.     Mr. Omarkheil believed that this was strictly a business meeting, aimed at strengthening UnitedHealth's relationship with the doctor and expanding the services the doctor offered through UnitedHealth.

46.     When Ms. Peluso and Mr. Omarkheil arrived at around 4:30 p.m., Mr. Omarkheil was surprised to learn that the doctor was actually Ms. Peluso's personal dentist and apparently a good friend of hers.

47.     Ms. Peluso and the dentist took Mr. Omarkheil into the dentist's back office, where they retrieved a bottle of vodka and began drinking.

48.     Mr. Omarkheil, palpably uncomfortable that his supervisor would take him to drink alcohol with her friend, intimated that he would like to leave.  Ms. Peluso turned to Mr. Omarkheil, knowing that consuming alcohol was against his religious beliefs, and pointedly stated:

**You don't drink because you're Muslim, so you can start taking notes for me.**

49.     Shocked, Mr. Omarkheil sat there mortified and was made to take notes on Ms. Peluso's personal conversations with her dentist (including extensive discussions concerning her upcoming wedding), as though he was her secretary or personal assistant.

50.     Throughout the evening, Ms. Peluso continued to make comments about Mr. Omarkheil's religious beliefs and the fact that he could not participate in drinking alcohol.

51.     After about an hour and a half of drinking and largely personal conversation, Ms. Peluso abruptly left after realizing that she needed to pick up her wedding gown.

52.     Mr. Omarkheil stayed behind for a time without Ms. Peluso in order to finally cover the business agenda he had prepared for discussion with the dentist.

53.     In early May 2018, Ms. Peluso scheduled a meeting with Mr. Omarkheil to review his team of supervisors and direct reports.

54.     At this meeting, Ms. Peluso singled out the only direct reports of Mr. Omarkheil's who were Black.

55.     With regard to one Black employee, who had emigrated from Africa to the U.S., Ms. Peluso commented that she could "**not believe that UnitedHealth would employ someone who does not speak English.  No one can understand him.**"  Mr. Omarkheil replied that this employee had an accent, but that he spoke fluent English and had no issues communicating with UnitedHealth's potential clients.

56.     Ms. Peluso also questioned Mr. Omarkheil's decision to promote his only African-American team member, even after Mr. Omarkheil explained that this employee had an excellent performance record and demonstrated commitment to the Company.

57.     Mr. Omarkheil perceived no other reason for Ms. Peluso's targeting of these two specific employees apart from their race.

### III.     MR. OMARKHEIL REQUESTS RELIGIOUS ACCOMODATIONS, AND MS. PELUSO'S DISPARATE TREATMENT AND HARASSMENT INTENSIFIES

58.     In or around May 2018, Mr. Omarkheil informed Ms. Peluso that he would be observing Ramadan for approximately one month.

59.     Ms. Peluso offhandedly responded, "**Oh, you pray too?,**" insinuating that Mr. Omarkheil, as a Muslim or non-Christian, was part of a group of people whose religious observance was somehow illegitimate or inferior to her own.

60.     Mr. Omarkheil tried to explain to Ms. Peluso the significance of the holiday, and that his religious practices and beliefs preclude him from work during the evening and on weekends during that time.

61.     Despite having been made well aware of his religious obligations and need for an accommodation in his schedule, Ms. Peluso continued to harass Mr. Omarkheil and attempted to bully him into attending evening and weekend events during times that he had made it clear he could not work for religious reasons.[3]

62.     Ms. Peluso chose to perceive Mr. Omarkheil's religious commitment as laziness, and treated him as though he was a delinquent looking for an excuse to slack off from work.

63.     Throughout the month of Ramadan, Ms. Peluso would call Mr. Omarkheil frequently, for no reason other than to harass him and confirm that he was doing his work.  On these calls, Ms. Peluso would raise her voice and demand to know where he was and what he was doing.

---

[3]     In his eleven years with UnitedHealth, Mr. Omarkheil did not previously have difficulty arranging accommodations for his religious practices.

64.     To Mr. Omarkheil's knowledge, Ms. Peluso did not call or check in on any other employee in such an accusatory or oppressive manner.

65.     Ms. Peluso would also email and text Mr. Omarkheil to check in on how many events he was attending.

66.     For example, on June 4, 2018, Ms. Peluso emailed Mr. Omarkheil, asking "how many community events did your team have this weekend? And how many of which did you attend?," even though she knew that he could not attend events on weekends.

67.     Mr. Omarkheil informed her that he did not attend any events during that time because of his religious observations, to which Ms. Peluso did not respond.

68.     Another time, Ms. Peluso answered the phone by saying, "**Let me guess, you were at prayers again?**"

69.     Another instance involved Mr. Omarkheil reminding Ms. Peluso that he could not take a call Friday evening because of Ramadan, to which she replied, "**Oh, I forgot you do that**."

70.     These statements were direct, unmistakably hostile expressions of Ms. Peluso's hostility towards Mr. Omarkheil in connection with his religion.

71.     Despite knowing that Mr. Omarkheil was not supposed to be working in the evenings throughout Ramadan, the following week Ms. Peluso assigned Mr. Omarkheil to multiple evening events throughout the five boroughs of New York City.

72.     Mr. Omarkheil was so intimidated by Ms. Peluso's demands that he felt compelled to attend these community events on June 9 and June 10, even though doing so violated his own closely held religious beliefs.

73.     Mr. Omarkheil believed that there was no other way to keep his job and satisfy Ms. Peluso's discriminatory demands.

74.     On June 12, 2018, Ms. Peluso was again harassing Mr. Omarkheil, this time by calling, texting and emailing him throughout the morning, asking where he was and who he was with.

75.     Mr. Omarkheil, who had been working all morning and did not see the missed messages, called Ms. Peluso back to confirm that he was indeed working that morning.

76.     Ms. Peluso bizarrely continued to doubt Mr. Omarkheil, and demanded that he put his on-site supervisor on the phone to speak with her.

77.     Mr. Omarkheil obliged, and handed his phone to his supervisor (who then put the phone on speakerphone) so that his supervisor could confirm that Mr. Omarkheil was indeed working.

78.     Ms. Peluso, apparently finally convinced that Mr. Omarkheil was working, asked Mr. Omarkheil's supervisor to return the phone to Mr. Omarkheil.

79.     Ms. Peluso, seemingly unaware that she was on speakerphone and within earshot of other UnitedHealth employees, went on to berate Mr. Omarkheil over the phone, and aggressively scold him for "**hanging out around the Muslim-Arab community way too much**."

80.     Mr. Omarkheil was deeply hurt and humiliated by Ms. Peluso's reprimand for working with people of his own race/ethnicity and religion, and insult was piled upon injury due to the fact he had to submit to this abuse in the presence of Arab and Muslim coworkers.

81.     Mr. Omarkheil interrupted Ms. Peluso to let her know that she was on speakerphone and told Ms. Peluso that he found her comment to be "very insensitive."

12

82.     Rather than apologize for her degrading comments, Ms. Peluso yelled at Mr. Omarkheil for having her on speakerphone and abruptly hung up on him.

## III.   MR. OMARKHEIL MAKES PROTECTED COMPLAINTS AND IS TERMINATED IN RETALIATION FOR THEM

83.     Mr. Omarkheil could no longer withstand being targeted based upon his race/ethnicity and religion.

84.     The next day, on June 13, 2018, Mr. Omarkheil found the courage to complain about Ms. Peluso's discriminatory treatment and called UnitedHealth's Human Resources ("HR") department.

85.     Mr. Omarkheil provided a detailed explanation to Human Resources and was told that someone would promptly investigate his claims and get back to him.

86.     After he made his complaint to Human Resources, Ms. Peluso began micromanaging and targeting Mr. Omarkheil even more aggressively.

87.      On June 20, 2018, Ms. Peluso told Mr. Omarkheil that he would not be receiving a quarterly bonus because of his region's poor performance.

88.     This supposed basis was utterly false, and, upon information and belief, Mr. Omarkheil's region had the strongest results in New York.

89.     When Mr. Omarkheil attempted to explain this to Ms. Peluso, she ended the conversation.[4]

90.     On Friday, June 22, Ms. Peluso called Mr. Omarkheil throughout the day, demanding that he tell her where he was and to discuss work-related items.

---

[4]     Ultimately, after Mr. Omarkheil reported this false basis for denial of the bonus to Human Resources, Mr. Omarkheil and his region were afforded their full quarterly bonus.

91.     When Mr. Omarkheil was able to take one of her calls, he reminded Ms. Peluso that he attends Friday prayers, and is unable answer his phone during that short window of time.

92.     Ms. Peluso, manifestly perturbed by Mr. Omarkheil's explanation, responded that she expects Mr. Omarkheil to pick up the phone whenever she calls going forward, in complete disregard for his religious obligations.

93.     Over a week later, Human Resources finally contacted Mr. Omarkheil to discuss his complaint.  Jennifer St. George, UnitedHealth's Employee Relations Case Manager, spoke with Mr. Omarkheil.

94.     However, rather than investigate Mr. Omarkheil's complaints or offer any anti-discrimination or anti-harassment training to Ms. Peluso, or take any other action, Ms. St. George advised Mr. Omarkheil to speak with David Willhoft, the Vice President of Sales & Marketing for UnitedHealth.

95.     Mr. Omarkheil did not understand how Mr. Willhoft, who has no known pertinent training in human resources, employee relations or discrimination law, would be able to investigate his complaints or remedy the hostile work environment.

96.     On June 25, 2018, nearly two weeks after Mr. Omarkheil issued his complaint of discrimination, Mr. Omarkheil scheduled a one-on-one meeting with Mr. Willhoft.

97.     Mr. Omarkheil was not even given an opportunity to explain the extensive harassment and inequitable treatment he had been facing from Ms. Peluso over the last few months, and was told that the meeting had to be over within 30 minutes due to Mr. Willhoff's "packed" schedule.

98.     Mr. Willhoft told Mr. Omarkheil that if he did not like Ms. Peluso's managing style, that he could "always find work elsewhere."

99.     Mr. Willhoft's solution was for Mr. Omarkheil to address his concerns with Ms. Peluso directly and without assistance from anyone in HR.

100.    Mr. Omarkheil was thunderstruck and in despair that the Company would put the onus on him to explain to his manager why what she was doing was unlawful and to train her in cultural sensitivity.

101.    However, desperate to keep his job and with no apparent alternative, Mr. Omarkheil agreed.

102.    Mr. Omarkheil emailed Ms. Peluso and told her that he felt that she was harassing him because of his "**beliefs and cultural background**," and that he felt "**embarrassed, demoralized, and degraded**" as a result, and requested a meeting to discuss these matters.

103.    On June 27, Mr. Omarkheil and Ms. Peluso met, and Mr. Omarkheil did his best to talk with her about cultural bias, religious discrimination and unlawful preferential treatment.

104.    Throughout the meeting, Ms. Peluso would nod her head and go through the motions, but did not appear genuinely engaged or apologetic at any point.

105.    Still terrified for his job, Mr. Omarkheil emailed Ms. St. George and detailed his meeting with Ms. Peluso.

106.    Ms. St. George then informed Mr. Omarkheil that she had closed his "case."  To Mr. Omarkheil's understanding, no investigation into Mr. Omarkheil's complaints was ever done, and UnitedHealth did not make any efforts to provide Ms. Peluso with any anti-harassment or anti-retaliation training.

107.    After Mr. Omarkheil's meeting with Ms. Peluso, she became extremely distant and appeared to avoid interacting with Mr. Omarkheil whenever possible.

108.     In or around mid-July, 2018, Mr. Willhoft visited Mr. Omarkheil and asked whether "things with [Ms. Peluso] had calmed down."

109.     Mr. Omarkheil reported that things had been relatively quiet, and that Ms. Peluso had not overtly harassed him since his official complaint to HR.

110.     Mr. Willhoft then inexplicably mentioned that Ms. Peluso is young compared to Mr. Omarkheil, and that "she has made a few mistakes" and that Mr. Omarkheil should "forgive and forget."

111.     Mr. Omarkheil found these comments by Mr. Willhoft discomforting, and believed that Mr. Willhoft was trying to dissuade him from making any further complaints about Ms. Peluso.

112.     On August 23, 2018, within two months of making his complaints of discrimination regarding Ms. Peluso's unlawful conduct, Mr. Omarkheil was brought into a meeting with Mr. Willhoft and Ms. Peluso and was told that his position was being eliminated and his employment was terminated effective immediately.[5]

113.     Upon information and belief, Mr. Willhoft, Ms. Peluso and Ms. St. George were all involved in the decision to terminate Mr. Omarkheil's employment.

114.     Despite nearly twelve-years of excellent performance, Mr. Omarkheil was not offered another position in the Company and was terminated without notice or cause.

115.     Upon information and belief, other UnitedHealth employees have come forward and made complaints against Ms. Peluso to Human Resources for her discriminatory and harassing behavior.

---

[5]     This was the first time Mr. Omarkheil was made aware that the Company was even contemplating terminating him or eliminating his position.

116.     As Mr. Omarkheil understands it, he was not the only employee to raise complaints of discrimination to UnitedHealth, only to be laid off mere weeks later.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of § 1981)
#### *Against All Defendants*

117.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

118.     Defendants have discriminated against Plaintiff on the basis of his race and/or ethnicity in violation of § 1981 by, *inter alia*, denying him the equal terms and conditions of employment and unlawfully terminating his employment because of his race and/or ethnicity.

119.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

120.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

121.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of § 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of § 1981)
#### *Against All Defendants*

122.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

123.     Defendants retaliated against Plaintiff by, *inter alia*, terminating his employment for his engagement in activities protected under § 1981.

124.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

125.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

126.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of § 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

127.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

128.     Defendants have discriminated against Plaintiff on the basis of his race, ethnicity, national origin, and/or religion in violation of the NYSHRL by, *inter alia*, denying him the equal terms and conditions of employment and unlawfully terminating his employment because of his race, ethnicity, national origin and/or religion.

129.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

130.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

131.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

132.    Defendants retaliated against Plaintiff by, *inter alia*, terminating his employment for his engagement in activities protected under the NYSHRL.

133.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

134.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendants Peluso, Willhoft and St. George*

135.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

136.    Defendants Peluso, Willhoft and St. George have aided and abetted the unlawful discrimination committed against Plaintiff.

137.    As a direct and proximate result of Defendants Peluso, Willhoft and St. George's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief.

138.     As a direct and proximate result of Defendants Peluso, Willhoft and St. George's

unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues

to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary

damages and other relief.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

139.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

140.     Defendants have discriminated against Plaintiff on the basis of his race, ethnicity,

national origin, and/or religion in violation of the NYCHRL by, *inter alia*, denying him the equal

terms and conditions of employment and unlawfully terminating his employment because of his

race, ethnicity, national origin, and/or religion.

141.     As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm, for which he is entitled to an award of damages, in addition to reasonable

attorneys' fees and expenses.

142.     As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and

emotional distress, for which he is entitled to an award of damages.

143.     Defendants' unlawful and discriminatory actions constitute malicious, willful and

wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive

damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

144.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

145.    By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, terminating his employment in retaliation for his protected activity.

146.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted by law, in addition to reasonable attorneys' fees and costs.

147.    Defendants' unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
### *Against Defendants Peluso, Willhoft and St. George*

148.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

149.    Defendants Peluso, Willhoft and St. George knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

150.    As a direct and proximate result of Defendants Peluso, Willhoft and St. George's unlawful aiding and abetting in violation of NYCHRL, Plaintiff has suffered, and continues to

suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

151.    As a direct and proximate result of Defendants Peluso, Willhoft and St. George's unlawful aiding and abetting in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

152.    Defendants Peluso, Willhoft and St. George's unlawful aiding and abetting constitutes malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

D.    An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

E.      An award of punitive damages;

F.      An award of costs that Plaintiff has incurred in this action, as well as reasonable

attorneys' fees to the fullest extent permitted by law; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 16, 2019
      New York, New York                    Respectfully submitted,

                                        **WIGDOR LLP**

By: _____
                                      Lawrence M. Pearson
                                      Hilary J. Orzick

                              85 Fifth Avenue
                              New York, NY  10003
                              Telephone:  (212) 257-6800
                              Facsimile:   (212) 257-6845
                              lpearson@wigdorlaw.com
                              horzick@wigdorlaw.com

                              *Counsel for Plaintiff*